# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| JESSICA A. HENDERSON, | CASE NO. 1:20-CV-1712-JRA |
| Plaintiff, | JUDGE JOHN R. ADAMS |
| v. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION |
| Defendant. | |

## INTRODUCTION

Plaintiff Jessica A. Henderson filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB") and supplemental security income ("SSI"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 4, 2020, this matter was referred for preparation of a report and recommendation pursuant to Local Rule 72.2, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 26, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

## PROCEDURAL BACKGROUND

Ms. Henderson filed for DIB and SSI on January 9, 2018, alleging a disability onset date of January 1, 2014. (Tr. 125, 142). Her claims were denied initially on April 25, 2018 and on

reconsideration on July 27, 2018. (Tr. 124-40, 141-57). She then requested a hearing before an administrative law judge. (Tr. 231-32, 233-35). Ms. Henderson (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on June 18, 2019. (Tr. 76). Before offering testimony, Ms. Henderson amended her alleged disability onset date to May 3, 2017.[1] In a July 25, 2019 written decision, the ALJ found Ms. Henderson was not disabled. (Tr. 55-68). The Appeals Council denied Ms. Henderson's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7; *see* 20 C.F.R. §§ 404.955, 404.981). Ms. Henderson timely filed the instant action on August 4, 2020. (ECF #1).

## FACTUAL BACKGROUND

### I. ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Henderson and VE Eric Dennison, presented during the hearing before the ALJ.

In the past, Ms. Henderson worked as a cleaner, a receptionist at a doctor's office, and a parts inspector. (Tr. 80). Ms. Henderson testified she has scoliosis and previously underwent surgery for the placement of Harrington rods. (Tr. 78). The bottom portion was removed after wear and tear. (Tr. 78). She has used a cane in her right hand for several years. (Tr. 77). Dr. Orra prescribed the cane. (Tr. 80). It helps her walk and sometimes helps to take the pressure off her back. (Tr. 77). Ms. Henderson has asthma and began using a breathing machine with Albuterol about one month before the hearing. (Tr. 81-82).

Ms. Henderson testified about her typical day. She wakes up, showers, and dresses herself, then sits or lays on a heating pad and props her feet up. (Tr. 78-79). She tries to be active but often

---

[1] In light of the prior unfavorable decision denying Ms. Henderson DIB and SSI benefits on May 2, 2017, the earliest possible alleged onset date is May 3, 2017.

must lay down in bed. (Tr. 79). She explained she has difficulty finding a comfortable position. (Tr. 85). Ms. Henderson lives with her boyfriend who does all the household chores. (Tr. 83-84). Her pain increases when she is stressed. (Tr. 84). At the hearing, she rated her pain at a level 8 and related some of her pain to the weather. (Tr. 80 – "I'm in a lot of a pain today because the rain is about to start."). She describes her pain as excruciating, "like pressure, like stabbing." (Tr. 82-83).

Ms. Henderson takes Vicodin for pain, which "just takes the edge off." (Tr. 81). She also wears a back brace when she is at home. (Tr. 81). She has tried injections and physical therapy, but neither alleviated her pain. (Tr. 85).

Eric Dennison testified. The ALJ posed the following hypothetical and asked Mr. Dennison to determine if such an individual could perform Ms. Henderson's past relevant work: able to lift and carry twenty pounds occasionally, ten pounds frequently; can stand and walk four hours of an eight-hour workday, and sit for six hours of an eight-hour workday; can occasionally push and pull and use a foot pedal; can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can constantly balance; can occasionally stoop, kneel, crouch, and crawl; can frequently handle and finger bilaterally; must avoid high concentrations of smoke, fumes, pollutants, and dust; and must avoid hazards including dangerous machinery and unprotected heights. (Tr. 88-89). The VE testified this hypothetical individual could perform Ms. Henderson's past work as a receptionist. (Tr. 89). The VE also testified such an individual could work as an information clerk, a shipping and receiving weigher, and a ticket seller. (Tr. 89-90). The number of jobs available nationally for each position would, however, be reduced by 50% based on the "stand and walk" limitation. (*Id.*).

3

The ALJ then posed an additional hypothetical: able to lift ten pounds occasionally, up to ten pounds frequently; can stand and walk two hours in an eight-hour workday, and sit for six hours in an eight-hour workday; can occasionally push and pull and use a foot pedal; can occasionally climb ramps and stairs; can never climb ropes, ladders, or scaffolds; can frequently balance; can occasionally stoop, kneel, crouch, and crawl; can frequently handle and finger bilaterally; should avoid high concentrations of smoke, fumes, pollutants, and dust; must avoid dangerous machinery and unprotected heights; and limited to simple, routine tasks that are low stress (no hard production quotas or piece-rate work). (Tr. 90-91). The VE testified such an individual could perform work as an ink printer, a dial marker, and a hand mounter. (Tr. 91). He determined the number of jobs available nationally for ink printer and dial marker would be reduced by 50% to account for the production quota limitation. (Tr. 91).

The VE testified an employer typically tolerates no more than six minutes of off-task time every hour. (Tr. 92). If the hypothetical individual needed to stand every thirty minutes for about five minutes at a time, this accommodation would be work-preclusive because the individual would be off task more than 10% of the workday. (Tr. 93).

II.     **PERSONAL AND VOCATIONAL EVIDENCE**

Ms. Henderson was 43 years old at the time of her amended alleged onset date, and 45 years old at the time of the administrative hearing. (Tr. 76-77). Ms. Henderson completed 11th grade and has a limited education. (Tr. 891). In the past, Ms. Henderson has been employed as a cleaner for a cleaning service, a parts inspector in a factory, and a receptionist at a pediatrician's office. (Tr. 312).

4

### III. RELEVANT MEDICAL EVIDENCE

**Back pain and scoliosis.** When Ms. Henderson was a child, she underwent surgery for scoliosis to correct the curvature of her spine. (Tr. 517). Harrington rods were placed along her thoracic spine at T4-T11 for stabilization. (Tr. 518). In 2001, the spinal hardware began loosening, requiring another back surgery to remove portions of the rods. (Tr. 1238-39). In December 2015, Ms. Henderson underwent an anterior cervical diskectomy and fusion at C5-C6 and C6-C7 to address degenerative changes causing pain to her neck and arm. (Tr. 572, 585, 568-570). Dr. John Belding provided treatment for Ms. Henderson's cervical spine issues.

Ms. Henderson has a long history of lower back pain and has been diagnosed with scoliosis in the thoracic and lumbar spine, osteoarthritis of the spine with lumbar radiculopathy, lumbar spondylosis, and thoracic and lumbosacral neuritis. (Tr. 1168-70). A spinal x-ray from May 2017 showed scoliosis in the thoracic and lumbar spine with a mild increase in thoracic curvature in comparison to a September 2015 study. (Tr. 531). A June 2017 x-ray of the lumbar spine revealed broad-based disc bulges at L1-L2 and L2-L3, a broad-based disc bulge at L5-S1 with mild encroachment of the right lateral recess, and a questionable split cord at T8-T9. (Tr. 532). At an appointment on June 14, 2017, Ms. Henderson complained of low back and right lateral leg pain ending above the knee and weakness in her legs. (Tr. 747). On examination, she displayed "very weak hip flexors and knee extensors bilaterally," but her straight leg raise test was negative. (Tr. 747). In July 2017, Ms. Henderson complained of low back and right lateral leg pain ending above the knee, which worsened with sitting. (Tr. 709). On August 2, 2017, Ms. Henderson had an epidural steroid injection at L5-S1 to address pain from lumbar spondylosis. (Tr. 708).

On August 21, 2017, Ms. Henderson attended a mental health session for an assessment due to her difficulty coping with chronic pain. (Tr. 759). She endorsed crying spells and poor sleep but felt that her depression was well-controlled with medication. (Tr. 760). Ms. Henderson reported being independent with activities of daily living but that she was limited by pain and fatigue. (*Id.*).

During an appointment with Deborah Blades, M.D., on February 23, 2018, Ms. Henderson complained of low back pain and muscle spasms, and exhibited severely reduced range of motion in her hips, a slow and cautious gait, a posture that flexed forward, bilateral paraspinal spasms at the thoracic and lumbar levels, and good strength bilaterally. (Tr. 786, 788-90). Ms. Henderson returned to see Dr. Blades on March 3, 2018. (Tr. 792). She complained of back pain and muscle spasms and, on physical examination, displayed joint tenderness but her gait and posture were normal. (Tr. 792-94). Dr. Blades reviewed Ms. Henderson's lumbar MRI and noted some facet arthropathy but no neural element compression. (Tr. 794). The doctor referred Ms. Henderson to Dr. Louis Keppler for further evaluation of her scoliosis. (*Id.*).

On April 13, 2018, Ms. Henderson saw Charles F. Misja, Ph.D., for a psychological evaluation at the behest of the Ohio Division of Disability Determination ("DDD"). (Tr. 890). Dr. Misja based his report on a 60-minute interview with Ms. Henderson and two pages of background information supplied by the DDD. (*Id.*). Dr. Misja noted Ms. Henderson walked into the examination room with a slight limp but did not use an assistive device. (Tr. 891). Dr. Misja also noted Ms. Henderson "got up and stretched about five times during the interview and moved about on the couch almost continuously as though she were in pain," and "the interview was remarkable for her constant repositioning herself on the couch and standing to stretch about five

6

times." (Tr. 892, 894). Dr. Misha opined the functional limitations posed by Ms. Henderson's depression were slight. (Tr. 894).

On May 18, 2018, Dr. Keppler provided Ms. Henderson with a facet block injection at L1-L2 to address facet arthrosis. (Tr. 1165). In June 2018, Ms. Henderson saw Dr. Keppler for a follow-up appointment. He noted the injection did not help Ms. Henderson significantly, but he did not recommend further surgery because it "would only cause more rapid degeneration of her remaining adjacent segments." (Tr. 1457).

Dr. Keppler filled out a Medical Source Statement on July 10, 2018 and referred to the medical records from Ms. Henderson's appointments on March 22 and June 11, 2018 in support. (Tr. 1308-09). He opined Ms. Henderson can occasionally lift and carry ten pounds, five pounds frequently; can stand and walk for a total of two hours in an eight-hour workday and can do so uninterrupted for up to a half hour; can sit for a total of four hours in an eight-hour workday and can do so uninterrupted for one hour; can rarely climb, balance, stoop, crouch, kneel, and crawl; can occasionally reach and perform fine and gross manipulation but rarely push and pull; and should be restricted from heights, moving machinery, pulmonary irritants, and noise, but not from temperature extremes. (*Id.*). Dr. Keppler also concluded Ms. Henderson needs to be able to alternate between sitting, standing, and walking at will, be allowed to elevate her legs to 45 degrees at will, and be allowed to rest an additional 30-60 minutes outside of the typical rest periods (defined as half-hour for lunch and two fifteen-minute breaks). (Tr. 1309). He noted her use of a cane and indicated that Ms. Henderson experiences severe pain that interferes with concentration, takes her off task, and would cause absenteeism. (Tr. 1309).

7

**Stress urinary incontinence.** On November 3, 2017, Ms. Henderson underwent urodynamic testing. (Tr. 515). The doctor diagnosed Ms. Henderson with stress urinary incontinence and overactive bladder. (Tr. 516). She attended pelvic floor physical therapy sessions to address those issues. (Tr. 511-14, 882-85). On May 11, 2018, Ms. Henderson had a cystoscopy and underwent surgery for placement of a urethral sling. (Tr. 1171-72). During her post-surgical follow-up appointment, Ms. Henderson endorsed increased urgency and frequency but no leakage and no stress urinary incontinence. (Tr. 1171). Her surgeon instructed Ms. Henderson to follow up with him in one year. (*Id.*).

IV.     STATE AGENCY MEDICAL CONSULTANTS

State agency medical consultants reviewed Ms. Henderson's record at the initial and reconsideration levels. At the initial level, a medical consultant completed a physical residual functional capacity assessment and determined Ms. Henderson can occasionally lift and carry twenty pounds, ten pounds frequently; can stand and walk for a total of four hours in an eight-hour workday; can sit for a total of six hours in an eight-hour workday; can frequently use bilateral upper extremities to push and pull, and occasionally use foot controls; can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; can never climb ropes, ladders, or scaffolds; can frequently handle and finger; can occasionally reach overhead; and should avoid concentrated exposure to air pollutants and hazards including unprotected heights and dangerous machinery. (Tr. 135-38). A medical consultant also performed a psychiatric review and concluded Ms. Henderson has mild limitations in her ability to interact with others; concentrate, persist, or maintain pace and adapt or manage oneself; and no limitation in her ability to understand,

8

remember, or apply information. (Tr. 132-33). At the reconsideration level, a different medical consultant adopted the same assessment. (Tr. 169-74).

## THE ALJ'S DECISION

The ALJ's decision, dated July 25, 2019, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since May 3, 2017, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: scoliosis; torn meniscus; mild bilateral carpal tunnel syndrome; asthma; depressive disorder; and generalized anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can lift 10 pounds occasionally and 10 pounds frequently;[2] can stand and walk for two hours in an eight-hour workday; can sit for six hours in an eight-hour workday; can occasionally push, pull, and operate foot pedals; can occasionally climb ramps or stairs; can never climb ladders, ropes, or scaffolds; can frequently balance; can occasionally stoop, kneel, crouch, and crawl; can constantly reach in all planes; can frequently handle and finger with the bilateral hands, but can feel constantly with the bilateral hands; no visual or communication limitations; should avoid high concentrations of smoke, fumes, pollutants, and dust; and must avoid entirely dangerous machinery and unprotected heights. Mentally, the claimant is limited to no complex tasks, but can perform simple, routine

---

[2] This is an accurate recitation of the ALJ's residual functional capacity findings. It remains unclear if this is a typographical error or the ALJ's intention because the ALJ also posed the same restriction, able to lift and carry ten pounds occasionally and frequently, in a hypothetical to the VE. (*See* Tr. 90).

      tasks and can perform low-stress tasks, defined as no high production quotas or piece rate work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 16, 1973 and was 43 years old, which is defined as a younger individual age 18-44, on the amended alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English. (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 3, 2017, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 58-67).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

10

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures

11

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Henderson argues the ALJ did not evaluate the medical opinion evidence in accordance with 20 C.F.R. § 404.1520c. (Pl.'s Br., ECF #12, PageID 1555). More specifically, she claims the ALJ did not provide sufficiently good reasons for rejecting Dr. Keppler's medical opinion and failed to articulate how the opinions were inconsistent with the medical evidence or otherwise unsupported. (*Id.*). In response, the Commissioner contends the ALJ reasonably determined that Dr. Keppler's opinion was unsupported by the record as a whole. I agree with Ms. Henderson.

For claims filed on or after March 27, 2017, an ALJ evaluates medical opinion evidence using a new paradigm. *See* 20 C.F.R. § 404.1520a(c). Ms. Henderson filed her claim on February 1, 2018; thus, § 404.1520a(c) controls. It provides the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)" including those from the claimant's medical sources. The ALJ is not required to place medical opinions into a hierarchy and is not required to give a treating source controlling weight. (*Id.*). Instead, the ALJ must articulate the consideration given to the medical opinions in

13

the record, grounded in the two "most important factors": supportability[3] and consistency.[4] 20 C.F.R. § 404.1520c(b).

Although the regulations presented in § 404.1520c eliminate physician hierarchy, deference to specific medical opinions, and assigning specific weight to a treating physician's medical opinion, an ALJ must still articulate the medical opinions were considered and how they were determined to be persuasive. *Houston v. Saul*, No. 1:20-CV-1371, 2021 WL 2635376, at *11 (N.D. Ohio June 25, 2021) (internal quotations omitted). The court reviews this articulation of persuasiveness to evaluate whether the ALJ properly considered the factors as set forth in the regulations. *Id*. An "ALJ's failure ... to meet these minimum levels of articulation frustrates [the] court's ability to determine whether [claimant's] disability determination is supported by substantial evidence." *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021) (internal quotation omitted).

With respect to Ms. Henderson's scoliosis and back pain, the ALJ found as follows:

> The medical evidence of record shows that [Ms. Henderson] has scoliosis. In December 2015, [Ms. Henderson] underwent an anterior cervical discectomy and fusion at C5-C6 and C6-C7. [Ms. Henderson] has since presented to the doctor complaining of lower back pain that radiates into the right lower extremity. Upon examination, [Ms. Henderson] has had tenderness, decreased ranges of motion, and muscle spasms, but with good strength and a relatively normal gait. X-rays of the spine in May 2017 showed a mild S-shaped scoliosis of the thoracic and lumbar spine, with stabilization of the thoracic curvature by Harrington rods. X-rays of the cervical spine in May 2017 demonstrated an anterior cervical fusion with discectomies and disc grafts from C5-C7. An MRI of the lumbar spine in June 2017 revealed no

---

[3] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[4] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

significant canal or foraminal stenosis, with a questionable split cord in the lower thoracic spine. Repeat x-rays of the cervical spine in January 2019 demonstrated a solid fusion construct in the neck. She has been prescribed anti-inflammatories and muscle relaxers for pain. [Ms. Henderson] received any [sic] injection and a L1-L32 [sic] facet block for pain, with no benefit. She has also participated in some physical therapy to help improve her symptoms. Despite her long history of spinal issues, [Ms. Henderson's] rods are noted to be in good position, her cervical fusion is solid, and she has not required any additional surgeries since her amended alleged onset date.

(Tr. 63-64).

The ALJ's evaluation of Dr. Keppler's opinion is brief:

The opinion of Dr. Louis Keppler, M.D., [Ms. Henderson's] own medical source, is not persuasive. The severity of his assessed limitations are [sic] not consistent with or supported by the medical evidence of record. While he stated that [Ms. Henderson] has severe exertional and postural limitations, the objective imaging of record shows only mild scoliosis with Harrington rods that are in good position and a solid cervical fusion. Additionally, she has not had any significant asthma exacerbations. Furthermore, [Ms. Henderson] has only required non-conservative[5] treatment measures since her amended alleged onset date. Therefore, Dr. Keppler's opinion is not persuasive.

(Tr. 65) (internal citations omitted).

I conclude the ALJ erred in his evaluation of Dr. Keppler's medical opinion. The reasons provided by the ALJ do not build an accurate and logical bridge to support his conclusion that Dr. Keppler's opinion is unsupported and inconsistent with the record. Rather, the ALJ's articulation of the medical opinion's supportability and consistency is scant and conclusory; moreover, some of the ALJ's reasons themselves are not supported by substantial evidence in the record.

Initially, the ALJ's recitation of the medical record acknowledges significant physical examination findings associated with back pain, including tenderness, decreased range of motion, and muscle spasms. It also avers to an x-ray from May 2017 characterized as establishing only

---

[5] I assume the ALJ meant Ms. Henderson only required conservative treatment. The scoliosis and back pain-related medical records post-dating the amended alleged onset date, May 3, 2017, consisted of steroid injections and therapy, but not additional surgery.

"mild" scoliosis with solid cervical fusion and well-placed Harrington rods. (Tr. 65). This x-ray refers to increased scoliosis curvature of Ms. Henderson's thoracic spine despite the presence of well-positioned Harrington rods. (Tr. 531). The decision also references an MRI taken in June 2017 as showing no significant canal or foraminal stenosis, but that MRI also describes broad-based disc bulges at multiple lumbar levels, one involving encroachment into the lateral recess, and a questionable split thoracic cord. (Tr. 63, 532). The ALJ also noted a facet block injection at L1-L2, provided by Dr. Keppler, did not give Ms. Henderson relief. (Tr. 63). The ALJ suggests in a conclusory fashion that mild scoliosis and a solid cervical fusion could not support Dr. Keppler's more restrictive limitations, but does not articulate how he concluded Dr. Keppler's opinion is inconsistent with or unsupported by the medical and nonmedical evidence. (*See* Tr. 65).

Additionally, Dr. Keppler determined that exposure to pulmonary irritants would affect Ms. Henderson, who has asthma and uses a machine for breathing treatments. (Tr. 1309). The state agency medical consultants concluded Ms. Henderson should avoid concentrated exposure to air pollutants due to asthma. (Tr. 137, 174). The ALJ's own residual functional capacity assessment provides that Ms. Henderson "should avoid high concentrations of smoke, fumes, pollutants, and dust." (Tr. 62). And yet, the ALJ found Dr. Keppler's opinion unpersuasive in part because "Ms. Henderson has not had significant asthma exacerbations." (Tr. 65). It is unclear how the ALJ's reasoning supports his conclusion that Dr. Keppler's opinion is unpersuasive, especially in light of the ALJ's adoption of a similar restriction to accommodate Ms. Henderson's asthma.

Moreover, the ALJ's determination that Ms. Henderson only required conservative treatment is inconsistent with the record as a whole. Ms. Henderson has undergone three back surgeries, two to address thoracic scoliosis and one for a diskectomy in her cervical spine. Ms.

16

Henderson was cautioned against further spinal surgery because it would cause more rapid degeneration in the spine. Nothing in the record suggests that Ms. Henderson's condition was not serious enough to warrant non-conservative treatment; only that non-conservative treatment, such as another spinal surgery, would cause more rapid degeneration elsewhere along the spine. The ALJ's opinion does not articulate how, when placed in its proper context, Ms. Henderson's conservative treatment is inconsistent with Dr. Keppler's opinion.

Although the revised regulations change the way medical opinions are evaluated, the ALJ must still provide a coherent explanation of his reasoning. As described above, the ALJ's reasons do not build an accurate and logical bridge between the record evidence and his conclusion that Dr. Keppler's opinion is unpersuasive. Without such a logical bridge, I am unable to determine that the ALJ's opinion is based on substantial evidence. Remand is, therefore, required. On remand, consistent with the revised regulations, the ALJ should articulate how he considered the consistency and supportability of Dr. Keppler's opinion.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying DIB and SSI and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: October 27, 2021

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

***ANY OBJECTIONS*** **to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time**

WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).